## JOHNSON *vs.* JAQUI.

1. Where the words of the grant are clear and unequivocal, there is no room for the application of the principle that the grant must be construed most strongly against the grantor.

2. The conveyance in this case gave the right to take the water from an upper to a lower pond—*held*, that no right could be inferred to take the water from the upper pond to a wheel below the lower pond. The parties must be confined to the plainly expressed agreement in the deed.

*Mr. Pitney*, for complainant.

*Mr. Vanatta* and *Mr. J. Cutler*, for defendant.

THE VICE-CHANCELLOR.

Whether the injunction issued in this case upon the filing of the bill, shall now, after final hearing upon the pleadings and proofs, be dissolved or made perpetual, depends very little, if at all, upon the testimony offered at the hearing, but must be decided by determining the true construction and effect of the grant contained in the defendant's deed. A brief statement will suffice to show the situation of things to

which the grant relates, and the few facts necessary to be known in order to settle its nature and extent.

In January, 1864, Charles Johnson, the father of the complainant, was the owner of two tracts of land in the county of Morris, on each of which, were a mill-pond, mill and appurtenances. The tracts were separated from each other by a public highway and differed considerably in their respective elevations; that on which a grist mill and pond were located, being much lower than the tract whereon were a saw mill, cider mill and pond. The difference between the ordinary levels of the two ponds, was from nine to ten feet. The water of the upper, or saw mill pond, was not used exclusively for the saw mill or cider mill, but to some extent was used to add to the water of the lower pond on the opposite side of the road. The water was carried from the upper to the lower pond through a wooden feeder or trunk, not more than a foot square, extending several hundred feet in a circuitous course, placed partly on piers, partly on the surface of the ground, and partly under it; running first across the homestead lot of Johnson to the highway or near it, then along the highway, and then under it, and emptying into the pond of the grist mill.

In this situation of things, Charles Johnson, by deed of January 18th, 1864, conveyed to Jaqui and Nehemiah H. Johnson, the grist mill lot, containing an acre and a-quarter of land, to the description of which were added the words of the grant now in controversy, as follows: "And also to include the pond, dam, tail-race and all the privileges heretofore had and used in connection with and for the purposes of said grist mill. Also, to have the water from the old saw mill pond of said Charles Johnson, in rear of his dwelling, as now carried in the trunk or feeder that carries the water from said pond to the grist mill pond above the dam, excepting only so much of said water as said Charles Johnson, his heirs or assigns, shall want for grinding apples at his cider mill near the old saw mill; and to have the privilege at all times, to enter upon all or any of the lands of said Charles

Johnson, along and joining said trunk or feeder, to alter, repair or renew the same at their convenience." ·

By a subsequent deed from Nehemiah H. Johnson, Jaqui became the owner of the whole grist mill premises. By the will of his deceased father, the complainant became the owner of the mill property and land and dwellings on the opposite side of the road. The water continued to flow through the trunk or feeder several years after Jaqui's purchase, and then ceased, the trunk having fallen into decay and disuse.

After the trunk had so decayed and been partially removed, Jaqui began to construct, on the complainant's land, a new conduit or trunk by which to carry the water from the upper pond, not to the lower one as expressed in the deed, but directly down to the grist mill, to apply it there to the driving of a wheel fifteen or twenty feet lower than the level of the lower pond. This conduit was to be a cylindrical, hooped flume, two feet in diameter, crossing the complainant's premises to the highway in nearly, though not exactly, the same route or location with the former one, but unlike the former one, to be mainly under ground, and at some points, to the depth of several feet, for which the defendant began to make excavations. At that juncture, the injunction was issued.

It is clear in my judgment, that what the defendant proposes and what he contends he is entitled to do, is not authorized by the above recited deed, and is a threatened invasion of the complainant's rights, which the latter is entitled to have enjoined. By the true construction of the grant, the defendant may take the water from the upper pond to the lower, but not to any other place he may select. He proposes to carry it to a point distant from the pond, much lower than the level of the pond, and to apply it there, under the head which his proposed arrangement is intended to furnish. The complainant insists that the consequences of this arrangement will be greatly detrimental to him ; that the sudden and rapid lowering of the water and the laying bare of the lands flowed by it, will be injurious to health and to the value and com-

fort of his dwelling. The defendant denies that these conse-quences will follow, and insists that no loss or injury will re-sult to the complainant. Witnesses were examined at the hearing, upon these points, but I am satisfied that their tes-timony cannot avail to affect the question to be decided. The inquiry is, what right over the water does the defendant take under the grant? Whether the right he now claims will impose a greater or less burden on the complainant than the right to carry the water to the pond, is an irrelevant inquiry. The place to which the water is to be taken is expressly stated in the grant. There is no ambiguity or uncertainty in the words, and no room for the application of the principle that the grant must be taken most strongly against the grantor. Because the water, after getting to the pond, can then be used to drive the wheel, is certainly no reason why it can be carried to the wheel in the first instance. This would be making for the parties by inference or reasoning an agree-ment different from that which their plain words express. It is of no avail to say that the proposed arrangement would be as advantageous to the complainant or more so than the former one. I do not think it would be so in fact, but if it were so proved, the answer is, it was not so agreed. So far, therefore, as the proposed work is being done to carry the water elsewhere than to the pond, the injunction prohibiting it, must be decreed to be perpetual.

There was discussion at the argument as to how far varia-tions from the location of the old trunk or feeder, and from its position above the surface of the ground or under it, would be permissible in constructing another trunk, in view of the words of the deed empowering the defendant " to alter, repair and renew the same at his convenience." These words apply solely to a trunk leading from one pond to the other. Such a trunk does not appear to be intended by the defendant. He does not propose to construct it, and any controversies or difficulties that might arise as to the location of it, if attempted to be constructed, cannot now be determined or anticipated. The thing granted is the right to take the water to the lower

pond. The terms by which the mode of doing it is described, may be regarded as admitting of some latitude of meaning. The mode of transfer will not be so treated or the words descriptive of the mode so strictly construed, as to defeat or impair the substance of the grant. The words descriptive of the mode will be construed most strongly against the grantor.

I will advise a decree for a perpetual injunction restraining the defendant from making any excavations on the complainant's land, and from doing on it any other acts in further prosecution of the proposed trunk or flume.